## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIC CHAMPAGNE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff(s), <br><br> v. <br><br> FANDUEL, INC., DRAFTKINGS, INC., ETHAN HASKELL, MATTHEW BOCCIO, and JOHN DOES NOS. 1-25, <br><br> Defendants. | Civil Action No.: <br><br><br> **CLASS ACTION COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Eric Champagne ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### PRELIMINARY STATEMENT

1.      This is a class action against Defendants FanDuel, Inc. ("FanDuel"), DraftKings, Inc. ("DraftKings" and, together with FanDuel, the "Corporate Defendants"), Ethan Haskell ("Haskell"), Matthew Boccio ("Boccio"), and John Does Nos. 1-25 (the "John Doe Defendants" and, together with Haskell and Boccio, the "Individual Defendants") for civil conspiracy and violations of New York General Business Law ("GBL") § 349, arising out of the Individual Defendants' use of non-public data, obtained through their employment by the Corporate Defendants, outside of the scope of their employment in order to gain unfair advantage over other

1

non-employee participants in daily fantasy sports competitions hosted on the Corporate Defendants' respective websites.

2.      Daily fantasy sports are a multibillion industry, dominated in the U.S. by FanDuel and DraftKings, which collectively account for 95% of the rapidly growing market.  Indeed, the Corporate Defendants' advertising blitz during the current National Football League ("NFL") season saw FanDuel and DraftKings become the leading paid advertisers in the U.S.

3.      Unbeknownst to Plaintiff and other proposed class members, each of the Corporate Defendants not only allowed its employees to participate in daily fantasy sports contests hosted by the other Corporate Defendant, but even more egregiously, allowed its employees, the Individual Defendants, to use non-public information gained in the course of their employment to gain an unfair competitive advantage over other participants.

4.      The consumer impact of Defendants' acts and practices is enormous.  Employees of DraftKings and FanDuel comprise a significant percentage of the high-volume, high-stakes players—the so-called "whales"—on the other company's website.  Despite comprising only 1.3 percent of daily fantasy players, these players account for 40 percent of all revenue collected by these companies and took home a staggering 90 percent of all winnings during the first half of the most recent fantasy Major League Baseball ("MLB") season.  The Individual Defendants, including the John Doe Defendants, while armed with non-public data obtained through their employment by one Corporate Defendant, improperly acted as "whale" participants in contests hosted by the other Corporate Defendant, with enormous success.  For instance, in one week alone, Defendant Haskell exploited his access to DraftKings' inside information to place second out of 229,885 competitors in a FanDuel competition, winning a cash prize of three hundred fifty thousand dollars ($350,000.00) after paying a mere twenty-five dollar ($25.00) entry fee.

5.     The Corporate Defendants' continued promotion of the their contests as skill-based competitions taking place on a level playing field, despite demonstrated and admitted knowledge of high levels of participation and unusual levels of success in such contests by employees of their competitor Corporate Defendant, while falsely reassuring participants of measures taken to ensure the integrity of such contests, constitutes egregious false advertising in violation of New York GBL § 349(a).  Moreover, by affirmatively permitting their own employees to participate in daily fantasy sports contests on the other Corporate Defendant's website and concealing this information from Plaintiff and other proposed class members, each of the Corporate Defendants conspired with the other, and with their employees, for mutual unlawful profit.  The Corporate Defendants profited and were unjustly enriched by inflated levels of participation by consumers unaware that their odds of success were materially worse than advertised, while the Individual Defendants profited by exploiting non-public information obtained during their employment by one Corporate Defendant to secure winnings in contests sponsored by the other.  All the foregoing acts and practices violated the express Rules and Terms of Use of both Corporate Defendants' contests and websites.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5,000,000.00 and there is diversity between a plaintiff and a defendant.

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant FanDuel is a resident of this judicial district under 28 U.S. C. § 1391(c).  Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred within this judicial district and, on information and belief, a substantial part of the property that is the subject of this action is located within this judicial district.

3

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) with respect to Defendant DraftKings because DraftKing's employees, with DraftKing's knowledge and assent, used nonpublic information obtained by virtue of their employment by DraftKings to participate in contests sponsored by Defendant FanDuel, which is resident here.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1)-(b)(2) and 1391(c) with respect to Defendant Boccio because Boccio is an employee of FanDuel within this judicial district, used FanDuel nonpublic information obtained within this judicial district to participate in DraftKings competitions, and, upon information and belief, is a resident of this judicial district.

10.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) with respect to Defendant Haskell because Haskell used nonpublic information obtained through his employment by DraftKings to participated in contests sponsored by FanDuel, which is resident here.

11.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1)-(b)(2) and/or 1391(c) with respect to the John Doe Defendants because all John Doe Defendants are either (a) FanDuel employees and therefore employed within this judicial district and, on information and belief domiciled here, or (b) DraftKings employees who, armed with nonpublic information obtained through their employment, participated in daily fantasy sports contests sponsored by FanDuel, which is resident here.

## **PARTIES**

12.      Plaintiff Eric Champagne is a resident of Fairfield, Connecticut.  Plaintiff has participated in contests sponsored by both FanDuel and DraftKings for which he paid entry fees.

13.      Defendant DraftKings is a Delaware corporation with its principal executive offices located at 225 Franklin Street, 26th Floor, Boston, Massachusetts 02110.

14.     Defendant FanDuel is a Delaware corporation with its principal executive offices located at 1375 Broadway, 6th Floor, New York, New York 10018.

15.     Defendant Haskell has been employed by DraftKings since June 2014 as the company's Content Manager.

16.     Defendant Boccio has been employed by FanDuel since August 2014 in the company's Product Operations department.

17.     The John Doe Defendants are individual employees of DraftKings and FanDuel, the proper identities of whom are unknown to the Plaintiff at this time but will be readily identifiable through reasonable discovery, who at relevant times exploited their access to non-public information obtained by virtue of their employment by one of the Corporate Defendants to compete with an undisclosed advantage in daily fantasy sports competitions sponsored by the other Corporate Defendant on its website.

## SUBSTANTIVE ALLEGATIONS

### Background: The Daily Fantasy Sports Industry

18.     Daily fantasy sports are a subset of fantasy sports games, in which participants compete against one another to build a team of professional athletes from a particular sport or professional sports league and earn points based on the actual statistical performance of those players in real-world competitions.   Unlike traditional fantasy sports, in which participants typically compete against one another over the course of a season, daily fantasy sports take place within a more abbreviated time frame, such as a week or single day of competition.   Daily fantasy sports are structured in the form of online competitions or contests, in which users pay an entry fee to participate and, depending on their overall performance, may win a share of a pre-determined pot, which in high-stakes contests can be in the hundreds of thousands or even millions of dollars.

Entry fees primarily go to fund prizes, while a portion goes to the contest provider, in this case Defendants FanDuel and DraftKings.

19.     In the U.S., the daily fantasy sports industry is dominated by Defendants FanDuel and DraftKings, which collectively account for 95% of the growing market. *Business Insider* has reported that the daily fantasy sports industry will take in $2.6 billion in entry fees in 2015 alone. Indeed, before and during the current NFL season, the Corporate Defendants participated in an advertising blitz that saw both companies become the leading paid advertisers in the U.S.

**Corporate Defendants' Employees' Exploitation of Inside Information**

20.     Until very recently, Corporate Defendants' employees were, incredibly, allowed to participate in contests hosted by the other company, and took advantage of their access to inside information to gain an unfair advantage over other participants. Such information included, *inter alia*, not only the various lineups chosen by the other contest participants and their frequency, but also detailed analytics on winning strategies, return on investment, and even how lineups from their own site would do if played in contests on the other company's site.

21.     On or about September 27, 2015, Defendant Haskell accidentally posted team ownership data, specifically the "percentage owned chart" for the Week 3 Millionaire Maker competition, on DraftKing's blog, *before* the lineups for that week's competition had fully locked. This chart displayed what percent of entrants in the competition "own" each player on their self-selected rosters. Possession of data of this sort during the time period when lineups can still be altered provides an immense competitive advantage, because daily fantasy sports competitions reward, among other things, selection of successful rosters that have not been widely chosen by other competitors. Yet, Haskell posted this information *before* the start of some of the remaining games in that week of NFL competition, which would allow anyone who saw the data to change

6

their lineups, to the extent not yet locked, based on the information.  When contacted, Haskell stated that the error was "100% my fault" and that "we'll be putting checks in place to make sure it doesn't happen again."  His statement is an admission, imputable to DraftKings, that sufficient checks did not exist beforehand.

22.     The following week, on or about October 4, 2015, Defendant Haskell placed second in FanDuel's large Sunday Millions contest, winning a prize of three hundred fifty thousand dollars ($350,000.00) after paying just twenty-five dollars ($25.00) to enter the contest.  Haskell's incredible second-place finish was among 229,885 competitor entries.

23.     As published by the website *Larry Brown Sports* and as illustrated below, Haskell's winning lineup had nearly identical usage rates on both FanDuel and DraftKings, meaning that the data on both websites correlated and that Haskell's inside access to the DraftKings lineup data would have provided him with a significant, undisclosed strategic advantage over other entrants.

| Player | FanDuel % | DraftKings % |
| --- | --- | --- |
| Andy Dalton | 2.3 | 2.5 |
| Adrian Peterson | 18.6 | 22.4 |
| Devonta Freeman | 6.7 | 8 |
| Randall Cobb | 8.2 | 12.3 |
| A.J. Green | 4.4 | 6 |
| Allen Hurns | 2 | 2.1 |
| Greg Olsen | 10.5 | 8.3 |
| Stephen Gostkowski | 10.8 | N/A |
| Seattle D | 22.6 | 30.7 |

24.     Furthermore, *Larry Brown Sports* published a detailed analysis of the astonishing success that Haskell has enjoyed in daily fantasy sports play.  Of Haskell's best 100 fantasy game results, as listed on his *RotoGrinders* profile, 83 were on DraftKings competitor FanDuel's website between October 2014 and the present, with all but five of them occurring in 2015.  This spate of success coincides with Haskell's employment at DraftKings, which began in June 2014.

25.     Even more incredible is the concentrated success that Haskell achieved in recent months.  For instance, as reported by Larry Brown Sports, Haskell won major points in 20 of 31 days in August 2015 by playing big money MLB games on FanDuel.  To wit:

**Ethan Haskell's absurd success playing FanDuel MLB in August 2015**

|  | First Cash | Second Cash | Third Cash | Fourth Cash |
|---|---|---|---|---|
| 8/1/2015 | 1st of 1810 in $40K MLB | 6 of 147 in $4 million MLB qualifier |  |  |
| 8/2/2015 | 28 of 4597 in $100K MLB | 32 of 4597 in $100K MLB |  |  |
| 8/3/2015 | 7th of 555 in $150K MLB | 4 of 166 in $15K MLB |  |  |
| 8/4/2015 | 34 of 8045 in $175K MLB |  |  |  |
| 8/5/2015 | 7th of 740 in $200K MLB | 12 of 185 $50K MLB | 3 of 112 in $10K MLB | 60 of 5747 in $125K MLB |
| 8/7/2015 | 10 of 2506 in $4 million MLB qualifier |  |  |  |
| 8/8/2015 | 8 of 102 in $4 million qualifier |  |  |  |
| 8/9/2015 | 11 of 5287 in $115K MLB |  |  |  |
| 8/10/2015 | 1st of 5747 in $125K MLB | 58 AND 86 of 740 in $200K MLB |  |  |
| 8/11/2015 | 13 of 1059 in $300K MLB | 58 of 7356 in $160K MLB |  |  |
| 8/12/2015 | 20 of 2667 in $60K MLB |  |  |  |
| 8/18/2015 | 1st of 12889 in 300K MLB | 31 of 12889 in $300K MLB |  |  |
| 8/20/2015 | 26 of 740 in $300K MLB |  |  |  |
| 8/21/2015 | 3rd of 740 in 200K MLB | 34 of 740 in $200K MLB | 36 of 9195 in $200K grand slam |  |
| 8/22/2015 | 54 of 687 in $200K MLB |  |  |  |
| 8/24/2015 | 35 of 1111 in $300K MLB |  |  |  |
| 8/25/2015 | 6 of 1333 in 400K MLB | 30 of 7078 in $160K |  |  |
| 8/28/2015 | 53 of 1050 in $300K MLB |  |  |  |
| 8/30/2015 | 44 of 4597 in $100K MLB |  |  |  |
| 8/31/2015 | 51 of 2180 in $700K MLB | 115 of 2180 in $700K MLB |  |  |

larrybrownsports.com



26.     Nor is Haskell an anomaly.  Shockingly, it is now known that employees of DraftKings and FanDuel comprise a significant percentage of the high-volume, high-stakes players—the so-called "whales"—on the other company's website.  Such players comprise only 1.3 percent of daily fantasy players yet account for over 40 percent of all revenue collected by the companies and, as reported by *Sports Business Daily* and the website *Mashable*, took home about 90 percent of all winnings in the first half of the most recent fantasy MLB season.

27.     Company spokespersons have admitted as much in widely publicized statements. *The New York Times* reported that DraftKings and FanDuel representatives have acknowledged that their employees are first and foremost players and that they have continued to play on competitor websites after starting their employment.  Additionally, *The New York Times* cited a statement by Ben Brown, a founder of *Daily Fantasy Sports Report*, that Defendant Boccio, a FanDuel employee with access to its internal data, had played on DraftKings.  A FanDuel

spokeswoman confirmed Brown's statement.  *The New York Times* further reported that Boccio won over fifty thousand dollars ($50,000.00) on DraftKings.

28.     Indeed, ESPN's well-regarded investigative program "Outside The Lines," citing a statement by a FanDuel representative, reported that DraftKings employees had won between $6 million and $10 million in contests on FanDuel.  On information and belief, the amount won by FanDuel employees on the DraftKings website is comparable.  Earnings payouts of that level would result from contests that took in many multiples more in consumer entry fees.

29.     It is now woefully apparent that both DraftKings and FanDuel lacked, and still lack, sufficient internal controls to bar their employees' access to sensitive, non-public data for any purpose outside the scope of their employment, including, *inter alia*, their personal use—or use by their friends and families—in participating in contests on the other company's website.  It is also now apparent that neither DraftKings nor FanDuel had <u>any</u> ban in place during the Class Period barring their employees from participating in such competitor website contests.

30.     For that matter, DraftKings and FanDuel apparently lacked even sufficient controls to ensure that the basic, published rules applicable to their contests were enforced.  As published by *Larry Brown Sports*, site users observed, for instance, ostensibly single-entry contests where individual competitors had multiple entries.

31.     On October 6, 2015, only after the foregoing suspicious activities were reported by the media and sports blogs, did Defendants DraftKings and FanDuel release a joint statement *temporarily* restricting their employees from competing on one another's websites.

### Government Investigations

32.     On or about October 14, 2015, the U.S. Department of Justice and the Federal Bureau of Investigations opened investigations into the activities of Defendants DraftKings and

FanDuel, including whether their competitions constitute illegal gambling in violation of federal law.  At the same time, the New York Attorney General's Office has asked both companies for internal data including win/loss records and player pricing algorithms used in their competitions. The same day, as reported by *Politico*, FanDuel hired its first Washington D.C. lobbying firm.

33.     On or about October 15, 2015, the Nevada Gaming Control Board ruled that daily fantasy sports competitions of the kind run by DraftKings and FanDuel are traditional gambling, meaning that a state-issued gambling license is required.  This outcome is not surprising, given that, in a comment on the website *Reddit*, DraftKings CEO Jason Robins described the competitions offered by his company as "betting" and stated, "The concept is almost identical to a casino, specifically poker.  We make money when people win pots."  Robins also referred to payments on these sites as "wagers" and "bets."

34.     These admissions at the highest corporate level underscore the severe and detrimental impact on competitive fairness caused by Defendants DraftKings' and FanDuel's permitting their employees to "wager" on one another's sites while utterly failing to create sufficient internal controls so as to restrict employee access to sensitive lineup data that provides unfair competitive advantage in making such "wagers."

## False Advertising

35.     Moreover, the admissions by the Corporate Defendants' executives and employees confirm their advertising, including not only the statements posted on their corporate websites throughout the Class Period but also the massive blitz before and during this NFL season, which saw both companies become the leading paid advertisers in the U.S., was false, deceptive, and misleading for failing to disclose that the odds of winning any money in competitions sponsored by Defendants DraftKings and FanDuel were greatly skewed against ordinary consumers by the

Corporate Defendants' knowingly permitting participation in contests by the Individual Defendants—employee-competitors who had access to sensitive, non-public data of the kind discussed herein providing them strategic advantages in contests sponsored by the other Corporate Defendant.

36.     Likewise, the "Terms of Use" and other statements on the websites of DraftKings and FanDuel have also contained false and misleading statements during relevant times, many of them designed to falsely tout the integrity of game play and to lull ordinary, non-employee consumers into the misbelief that playing odds were even for all competitors and that the Corporate Defendants were taking necessary steps to ensure the fairness of contest play.  For instance:

(a)     DraftKings' "Terms of Use" misstated the integrity of its contests while omitting any disclosure of the material unfair advantage held by FanDuel employees competing on its website, stating, "From all entries received for each Contest, winners are determined by the individuals who use their skill and knowledge of relevant sports information and fantasy sports rules to accumulate the most points according to the corresponding scoring rules."  FanDuel's "Terms of Use" contained a nearly identical statement that likewise omitted any disclosure about participation by DraftKings employees with advantageous access to non-public information.

(b)     Both companies also falsely and misleadingly reassured site users that they would police the integrity of their contests and remove those who were engaged in unfair or uncompetitive behaviors.  DraftKings' "Terms of Use" stated, "The Company, at its sole discretion, may disqualify any entrant from a Contest, refuse to award benefits or prizes and require the return of any prizes, if the entrant engages in conduct the Company deems to be improper, unfair, or otherwise adverse to the operation of the Contest or is in any way detrimental to other entrants."  FanDuel's "Terms of Use" contained a nearly identical statement.  Similarly, FanDuel's

"Rules" description stated, "There are a variety of behaviors that are detrimental to FanDuel and other players on the Service.  Engaging in those behaviors may result in suspension of some or all functions associated with your account.  Suspended players are expected to respect the disciplinary actions imposed on their accounts…."

### Defendants Reaped Improper Benefits And Profit

37.     Due to the foregoing facts and circumstances, the Individual Defendants were unjustly enriched by benefitting from inside information gained through their employment by one Corporate Defendant to artificially increase their odds of payouts, and by securing larger and more frequent payouts, while competing against unsuspecting consumers in contests sponsored by the other Corporate Defendant.

38.     At the same time, the Corporate Defendants were unjustly enriched by garnering increased entry fees in their highly-advertised contests by unsuspecting consumers, a portion of which the Corporate Defendants retained as profits.  They likewise benefitted from being able to offer their employees an improper and undisclosed "perk" – in the form of a material, undisclosed advantage while competing on the other Corporate Defendant's website – that permitted them to attract more employee candidates and to pay them less in salary or wages than they otherwise would have had to pay them.

39.     The mutual receipt of improper benefits and profits by both Corporate Defendants and their employees was known to Defendants at all relevant times.  Yet, Defendants did nothing to prevent such improper benefits and profits from occurring and, indeed, intentionally sought to exploit them and knowingly conspired to do so.

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this lawsuit as a class action on behalf of himself and all other similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) and/or (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

41.     The proposed nationwide class (the "Class") Plaintiff seeks to represent is defined as follows:

> All persons in the United States who, on or before October 5, 2015, deposited money into a FanDuel or DraftKings account and competed in either any fantasy sports contest sponsored by FanDuel where entries were made by employees of DraftKings or in any fantasy sports contest sponsored by DraftKings where entries were made by employees of FanDuel (the "Nationwide Class").

42.     Plaintiff also brings this action on behalf of a nationwide sub-class (the "New York Sub-Class") under New York GBL § 349 (as set forth in Count II below), defined as follows:

> All persons in the United States who, on or before October 5, 2015, deposited money into a FanDuel account and competed in any fantasy sports contest sponsored by FanDuel where entries were made by employees of DraftKings (the "New York Subclass").

43.     Excluded from the Classes are: (1) the Corporate Defendants; any entity or division in which they have a controlling interest; their legal representatives, officers, directors, assignees, and successors; and their current or former employees; (2) the Individual Defendants and members of their immediate families; (3) the Judge to whom this case is assigned and the Judge's staff; and (4) governmental entities. Plaintiff reserves the right to amend the Class definitions and to add additional sub-classes as appropriate if discovery and further investigation reveal that the Class should be expanded, otherwise divided into subclasses, or modified in any other way.

**Numerosity & Ascertainability**

44.     Although the exact number of Class and New York Sub-Class members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. For instance, the single Millionaire Maker competition in which Defendant Haskell improperly won three hundred fifty thousand dollars ($350,000.00) alone had nearly 230,000 participants.

45.     The disposition of the claims of these Class and New York Sub-Class members in a single action will provide substantial benefits to all parties and to the Court. Class members are readily identifiable from information and records in Defendants' possession, custody, or control.

**Typicality**

46.     Plaintiff's claims are typical of the claims of Class and New York Sub-Class members, as Plaintiff and the other members of the Class and the New York Sub-Class sustained damages arising out of the same wrongful conduct by Defendants, as alleged herein.

**Adequate Representation**

47.     Plaintiff will fairly and adequately represent and protect the interests of the Class and the New York Sub-Class. Plaintiff has retained counsel with substantial experience in prosecuting complex and class action litigation nationwide, including consumer class actions.

48.     Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class and the New York Sub-Class, and have the financial resources to do so.  Neither Plaintiff nor his counsel have interests adverse to those of the Class or the New York Sub-Class.

**Predominance of Common Issues**

49.     There are numerous questions of law and fact common to Plaintiff and Class and New York Sub-Class members that predominate over any question affecting only individual Class

or New York Sub-Class members, the answer to which will advance resolution of the litigation as to all Class and New York Sub-Class members. These common legal and factual issues include, *inter alia*:

    a.  whether Defendants engaged in a corrupt or unlawful combination and/or agreement with each other to commit an unlawful act;

    b.  whether the Corporate Defendants violated state consumer protection statutes, including, *inter alia*, New York GBL § 349, and if so, what remedies are available by law;

    c.  whether the Individual Defendants used nonpublic data and/or information gained during their employment by the Corporate Defendants to gain an advantage in FanDuel or DraftKings fantasy sports competitions;

    d.  whether Defendants were unjustly enriched by their actions as alleged herein;

    e.  whether the Court should enjoin Defendants from continuing to engage in the conduct complained of herein;

    f.  the appropriate measure of relief, including, but not limited to, a preliminary and/or permanent injunction; and

    g.  the extent of the damages caused by Defendants' acts.

**Superiority**

35.    Plaintiff and other Class and New York Sub-Class members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

16

36.     Absent a class action, most Class and New York Sub-Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.   This is particularly so because Defendants FanDuel and DraftKings run competitions requiring entry fees as low as one dollar.  Indeed, the Millionaire Maker contest in which Defendant Haskell won three hundred fifty thousand dollars ($350,000.00) cost him only a twenty-five dollar ($25.00) entry fee.  Because of the relatively small size of the individual Class members' and New York Sub-Class members' claims, it is likely that few if any Class or New York Sub-Class members could afford to seek legal redress for Defendants' misconduct as alleged herein. Absent a class action, Class and New York Sub-Class members will continue to incur damages, and Defendants' misconduct will continue without remedy.

37.     Class action treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class action treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

### COUNT I
### (Civil Conspiracy)

**(Brought on Behalf of the Plaintiff and the Class against all Defendants)**

38.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

39.     As described above, Defendants engaged in a corrupt or unlawful combination and/or agreement with each other, and continue to act in concert after their unlawful acts were discovered.

40.     Defendant FanDuel knew that it lacked any meaningful internal controls preventing employee access to sensitive, non-public information about fantasy sports contests on its own website that would yield strategic advantage if used by its employees in competing in fantasy sports contests sponsored by Defendant DraftKings.  Defendant FanDuel also knew that its employees participated in fantasy sports contests sponsored by Defendant DraftKings and that it had not enacted any prohibition whatsoever against their doing so.  Defendant FanDuel knew that the foregoing facts constituted a material "perk" to its employees that would enable it to attract a greater employee candidate pool and to compensate its employees less than it would absent such a "perk."  Defendant FanDuel also knew that nondisclosure of these facts meant that its false and misleading advertising would generate artificially enhanced participation rates by unsuspecting consumers, thereby generating greater revenues and profits.

41.     Defendant DraftKings knew that it lacked any meaningful internal controls preventing employee access to sensitive, non-public information about fantasy sports contests on its own website that would yield strategic advantage if used by its employees in competing in fantasy sports contests sponsored by Defendant FanDuel.  Defendant DraftKings also knew that its employees participated in fantasy sports contests sponsored by Defendant FanDuel and that it had not enacted any prohibition whatsoever against their doing so.  Defendant DraftKings knew that the foregoing facts constituted a material "perk" to its employees that would enable it to attract a greater employee candidate pool and to compensate its employees less than it would absent such a "perk."  Defendant DraftKings also knew that nondisclosure of these facts meant that its false and misleading advertising would generate artificially enhanced participation rates by unsuspecting consumers, thereby generating greater revenues and profits.

42.     Until October 6, 2015, neither Corporate Defendant prohibited its employees from participating in fantasy sports contests on the other Corporate Defendant's website.

43.     By affirmatively permitting the other Corporate Defendant's employees, including the Individual Defendants, to participate in fantasy sports contests on its site and by concealing this fact from Plaintiff and other members of the proposed Class, each of the Corporate Defendants committed fraud.

44.     By accessing material, nonpublic information of the kind described herein during the course of their employment by one Corporate Defendant, and by using such information for strategic advantage in competing in contests sponsored by the other Corporate Defendant, each of the Individual Defendants committed fraud.

45.     By affirmatively permitting the other Corporate Defendant's employees, including the Individual Defendants, to participate in fantasy sports contests on its site, each of the Corporate Defendants assisted and encouraged the other Defendants' commission of fraud.

46.     These overt acts were committed pursuant to or in furtherance Defendants' conspiracy to: (a) allow the Corporate Defendants' employees and officers, including the Individual Defendants, to use material, non-public information accessed through their employment to enjoy improperly and artificially enhanced odds of winning and to actually win money in fantasy sports contests sponsored by the other Corporate Defendant; and (b) to allow the Corporate Defendants to profit by (i) engaging in false and deceptive advertising that failed to disclose the misconduct of the Individual Defendants and thereby resulted in materially and artificially increased participation rates by unsuspecting consumers in their fantasy sports contests, thereby generating improperly enhanced entry fee payments and resultant revenues and profits and/or (ii) paying their respective employees lower salaries and wages in exchange for the "perk" of allowing

them to use material, non-public information to enjoy increased odds of winning and increased monetary winnings in fantasy sports contests sponsored by the other Corporate Defendant.

47.      As a direct and proximate result of Defendants' concerted actions, Defendants are liable to Plaintiff and the other members of the proposed Classes.

## COUNT II
### (Violation of New York GBL § 349)

**(Brought on Behalf of the Plaintiff and the New York Sub-Class against Defendant FanDuel)**

48.      Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

49.      New York GBL § 349(a) states, in relevant part, that "[d]eceptive acts or practices in the conduct of any business, trade or commerce in the furnishing of any service in this state are hereby declared unlawful."

50.      Defendant FanDuel engaged in acts and practices in conducting its business in the State of New York that were deceptive and/or misleading in a material way, and that were likely to mislead a reasonable consumer acting reasonably under the circumstances existing at the time.

51.      Defendant FanDuel's deceptive acts include, *inter alia*, publishing and disseminating false and deceptive advertising, created and/or approved in New York, in the form not only of statements on Defendant FanDuel's website, but also digital, print, and physical marketing and advertising, which: (a) falsely touted the integrity of the fantasy games it sponsored, including that any participants chances of winning were based on that participant's own skill and knowledge; (b) falsely touted the security steps it purportedly took to ensure the integrity of such games; (c) failed to disclose that it permitted DraftKings employees to participate in its contests and that it permitted such participation without any meaningful safeguards to ensure that

competition odds were not affected by the use by DraftKings employees of material nonpublic information of the kind that FanDuel's own employees could access; and (d) failed to disclose that it permitted its own employees to engage in similar conduct in DraftKings-sponsored contests.

52.     As a direct and proximate result of Defendant FanDuel's deceptive acts, Plaintiff and other members of the New York Subclass paid entry fees to Defendant FanDuel and participated in Defendant FanDuel's fantasy sports competitions, where the odds of winning were worse than advertised, where the competition integrity had been compromised, and where the entry fees paid were higher than and not reflective of the actual gaming experience offered.

53.     Plaintiff and the other members of the New York Subclass, all of whom paid entry fees to participate in Defendant FanDuel's fantasy sports competitions, have been damaged as a result of Defendants' violations of New York GBL § 349(a) and seek recovery of the actual damages they suffered as a result, in an amount to be determined at trial.

54.     Pursuant to New York GBL § 349(h), Plaintiff and other members of the New York Subclass also seek to enjoin Defendant FanDuel from further violations of New York GBL § 349(a) by prohibiting Defendant FanDuel from: (a) permitting its own officers, employees, and/or their officers' and employees' family members from using non-public data obtained by virtue of their employment by Defendant FanDuel to compete in contests sponsored by Defendant DraftKings;  (b) permitting Defendant DraftKings' officers, employees, and/or their officers' and employees' family members from using non-public data obtained by virtue of their employment by Defendant DraftKings to compete in contests sponsored by Defendant FanDuel; and (c) perpetuating the lax and insufficient internal controls environment that has permitted its own officers and employees to access and misuse nonpublic information in the manner described herein.

55.     Pursuant to New York GBL § 349(h), Plaintiff and the other members of the New York Subclass seek treble damages and an award of reasonable attorneys' fees.

## COUNT III
**(Unjust Enrichment)**

**(Brought on Behalf of the Plaintiff and the Class against all Defendants)**

56.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

57.     Defendants have received and retained a benefit from Plaintiff and other members of the proposed Class, resulting in inequity.

58.     The Corporate Defendants induced Plaintiff and other members of the proposed Class to participate in fantasy sports competitions on FanDuel's and DraftKings' websites by promoting these competitions as skill-based competitions taking place on a level playing field, when, in fact, each of the Corporate Defendants permitted its own employees to exploit their access to material, non-public data to participate with enormous success in the contests hosted by the other Corporate Defendant.

59.     The Corporate Defendants profited and were unjustly enriched by inflated levels of participation and increased entry fees, a portion of which the Corporate Defendants retained as revenues and profits, paid by consumers to compete in the Corporate Defendants' contests while unaware that their odds of success were materially worse than advertised.

60.     The Individual Defendants profited and were unjustly enriched by benefitting from their access to inside information gained through their employment by one Corporate Defendant to artificially increase their odds of payouts, and by securing larger and more frequent payouts, while competing against unsuspecting consumers in contests sponsored by the other Corporate Defendant.

61.     As a result of Defendants' conduct, the amount of its unjust enrichment should be disgorged, in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE** Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, and certifying Plaintiff as the Class representative;

B.      Awarding Plaintiff and the other members of the Classes statutory, treble, punitive, or any other form of damages provided by and pursuant to the statutes cited above;

C.      Awarding Plaintiff and the other members of the Classes restitution, disgorgement or other monetary or equitable relief provided by and pursuant to the common law claims and statutes cited above or as the Court deems just proper;

D.      Enjoining Defendants from continuing the wrongful acts and practices alleged;

E.      Awarding Plaintiff and the other members of the Classes pre-judgment and post-judgment interest;

F.      Awarding Plaintiff and the other members of the Classes reasonable attorneys' fees and costs of suit, including expert witness fees; and

G.      Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands trial by jury.

Dated:   October 23, 2015

Respectfully submitted,

**POMERANTZ LLP**


*/s/Matthew L. Tuccillo*
Matthew L. Tuccillo
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  mltuccillo@pomlaw.com
       ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*